J-S26001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: ADOPTION OF: A.E.C., MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: J.C., JR., FATHER | No. 1963 MDA 2014 |

Appeal from the Decree October 16, 2014
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s): Adoptee # 18-2014

BEFORE:  OTT, J., WECHT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                    **FILED JUNE 30, 2015**

J.C., Jr. ("Father"), appeals from the decree entered October 16, 2014, in the Court of Common Pleas of Northumberland County, which involuntarily terminated his parental rights to his minor daughter, A.E.C. ("Child").[1]  We affirm.

The record reveals the relevant factual and procedural history, as follows.  Northumberland County Children and Youth Services ("CYS") received a referral regarding the birth of Child in December of 2012.  N.T., 10/8/2014 (Part 2), at 3, 5.  The referral related to substance abuse by Mother, but CYS later was informed that Father also suffered from substance

---

[1] By separate decree entered that same day, the orphans' court involuntarily terminated the parental rights of Child's mother, L.D. ("Mother"), from which she filed a notice of appeal.  The disposition of Mother's appeal is by separate memorandum.

abuse issues. *Id.* at 4. Northumberland County Drug and Alcohol Services arranged for Father to attend a detox center for 7 days. *Id.* at 5. Father was released in January of 2013, and was scheduled for individual outpatient counseling, but did not attend. *Id.* CYS initially was unable to make contact with Father following his release, and Father's whereabouts were unknown. *Id.* at 6. Father did attend a meeting on March 16, 2013, during which he provided a urine sample. *Id.* at 20. The sample tested positive for illegal substances, and Father admitted to heroin use. *Id.* at 20-21.

Meanwhile, Child was diagnosed with congenital nephrotic syndrome, a severe kidney condition.[2] *Id.* at 6. Child was discharged from the hospital in March of 2013, and went to live with Father and Mother under the supervision of Father's father and stepmother. *Id.* at 7. During this time, CYS was unable to obtain a urine sample from Father in order to perform additional drug screens. *Id.* at 7-8. On one occasion, Father claimed that he was unable to provide a sample and went to sleep. *Id.* at 4. On another occasion, Father simply left the home, and Mother reportedly did not know where he went. *Id.* at 9-10, 20. Father and Mother also failed to bring Child to two of her appointments, and were late in bringing Child to a third.

---

[2] As discussed in greater detail, *infra*, Child requires constant medical care, including nightly dialysis treatments. N.T., 10/8/2014 (Part 2), at 61-62.

*Id.* at 8-9. Ultimately, Child was placed in foster care on May 3, 2013, and adjudicated dependent on June 6, 2013.[3] *Id.* at 9.

On May 29, 2014, CYS filed a petition to involuntarily terminate Father's parental rights to Child.[4] A termination hearing was held on October 8, 2014, during which the orphans' court heard the testimony of CYS caseworkers Jennifer Riley and Leslee Maturani. The court heard further testimony from Child's foster father, C.Y. ("Foster Father"), and Father.[5] The court entered its decree terminating Father's parental rights on October 16, 2014. On November 12, 2014, Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father now presents the following issues for our review:

_____

[3] The date of Child's adjudication of dependency is not clear from the certified record on appeal. CYS caseworker, Jennifer Riley, testified that she believed the adjudication took place on June 5, 2013. N.T., 10/8/2014 (Part 2), at 9. The orphans' court lists June 6, 2013, as the date of Child's adjudication in its opinion pursuant to Pa.R.A.P. 1925(a).

[4] In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court states that CYS filed its termination petition on June 3, 2014. However, the petition is stamped as having been filed on May 29, 2014. On June 3, 2014, the court entered an order scheduling the termination hearing, and issued notice of the hearing.

[5] The termination hearing was split into two parts. CYS presented its evidence with respect to Mother during the first part of the hearing, and then presented its evidence with respect to Father during the second part.

I. Did the [orphans'] court abuse its discretion when determining that [CYS] presented clear and convincing evidence to support grounds for involuntary termination of [Father's] parental rights?

II. Did the [orphans'] court abuse its discretion in determining that the best interests of the child would be served by terminating [Father's] parental rights?

Father's brief at 6 (suggested answers and unnecessary capitalization omitted).

We review this appeal according to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel Bassett v. Kia Motors America, Inc.*, [613] Pa. [371], [455,] 34 A.3d 1, 51 (2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility

determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). This Court need only agree with any one subsection of 23 Pa.C.S.A. § 2511(a), in addition to

Section 2511(b), in order to affirm the termination of parental rights. ***In re***

***B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863

A.2d 1141 (Pa. 2004). Here, we conclude that the orphans' court properly

terminated Father's parental rights pursuant to Sections 2511(a)(1) and (b),

which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A § 2511(a)(1) and (b).

With respect to Section 2511(a)(1), "the moving party must produce

clear and convincing evidence of conduct, sustained for at least the six

months prior to the filing of the termination petition, which reveals a settled

intent to relinquish parental claim to a child or a refusal or failure to perform

parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006)). Further,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id.* (quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998)).

In *In re Adoption of S.P.*, *supra*, our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The *S.P.* Court stated:

> Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*In re Adoption of S.P.*, 47 A.3d at 828. The *S.P.* Court continued:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent

- 7 -

does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[**McCray**] at 655 (footnotes and internal quotation marks omitted). . . .

*In re Adoption of S.P.*, **supra**; **see also In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (internal citations omitted) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child").

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id**. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Father argues that his parental rights should not have been terminated because he was able to remedy the issues leading to Child's adjudication of dependency. Father's brief at 15-17. Father asserts, *inter*

- 8 -

*alia*, that he obtained drug treatment and endeavored to maintain a relationship with Child. ***Id.*** Father further emphasizes Child's tender age, and contends that he should be given the opportunity to learn how to care for Child, and to establish a bond with her. ***Id.*** at 19-20.

In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court found as follows:

> The Petition for Termination of Parental Rights was filed on June 3, 2014. The six months immediately preceding this date correspond with a time period during which [] Father was either incarcerated in the Union County Prison, living out of state, or living in a halfway house in Philadelphia. [] Father provided no housing, financial support, or medical care, for . . . Child during this time period. He was not employed, nor did he have independent transportation. He attended one supervised visit on January 31, 2014, after his release from incarceration. [] Father did not request visits while in Union County Prison. [] Father did send three letters to . . . Child, but did so only after prompted by a[] [CYS] caseworker. The letters all occur during a short period of time between November 26, 2013 and December 20, 2013, with no correspondence occurring after that brief window.

> During this time period . . . [C]hild was hospitalized several times and required daily medical care while out of the hospital. [] Father did not even attempt to attend medical training to learn how to address . . . Child's medical concerns (despite having been court-ordered to do so), let alone actually provide any medical support or care for . . . Child. This inaction on the part of . . . Father points to both a settled purpose of relinquishment and a failure to perform parental duties during the relevant six month period.

> Further, an Aggravated Circumstances Order was entered on July 18, 2014, citing the failure of both [] Father and [] Mother to maintain substantial and continuing contact with . . . Child for a period of six months. During much of this time period, . . . Father's whereabouts were unknown, as he failed to maintain contact with [CYS].

Orphans Court Opinion, 12/6/2014, at 5-6 (citations to the record omitted). The testimonial evidence supports the court's findings, as follows.

CYS caseworker, Jennifer Riley, testified concerning the circumstances leading up to Child's placement in foster care, discussed *supra*. N.T., 10/8/2014 (Part 2), at 3-10. Shortly after Child's placement on May 3, 2013, Ms. Riley discovered that Father had moved to New Jersey. *Id.* at 9, 12-13. Father was incarcerated for retail theft the day after he moved. *Id.* at 13. Ms. Riley recalled that her only contact with Father after that date was a letter she received in June or July of 2013. *Id.* at 13, 15. Ms. Riley believed that Father was incarcerated in New Jersey for "several months" before being transferred to a facility in Union County. *Id.* at 14. Father did not request visitation with Child from Ms. Riley while incarcerated. *Id.*

Ms. Leslee Maturani testified that she took over as Child's caseworker in late October or early November of 2013, while Father remained incarcerated in Union County Prison. *Id.* at 26-27. During Father's incarceration, he sent Ms. Maturani several letters to be given to Child. *Id.* at 27, 30-31. Specifically, these letters were received on November 26, 2013, December 16, 2013, and December 20, 2013. *Id.* Ms. Maturani noted that she sent Father a letter and pamphlet on December 2, 2013, explaining, *inter alia*, that he could send letters to Child. *Id.* at 38-39, 41. Ms. Maturani agreed that Father may have sent the letters because he was encouraged to do so by her documentation. *Id.* at 42, 51. Following

Father's release from incarceration, he did not have employment, nor did he have independent transportation. *Id.* at 27-28.

Ms. Maturani noted that she first met Father during a supervised visit at CYS on January 31, 2014. *Id.* at 27. That was the only visit between Father and Child that she supervised during her assignment to this case. *Id.* at 29. Father failed to attend a permanency review hearing on February 6, 2014, reportedly to attend a drug and alcohol evaluation. *Id.* at 32-33. While Father attended a custody hearing pertaining to a different child on February 10, 2014, he failed to appear for a family center intake scheduled later that day. *Id.* at 33. Ms. Maturani next spoke to Father on February 24, 2014, and April 2, 2014. *Id.* at 34-35. Father did not request a visit with Child on either date. *Id.*

Ms. Maturani further testified that she learned in April or May of 2014 that Father again had moved to New Jersey. *Id.* at 35. On May 9, 2014, Father contacted Ms. Maturani and told her that he was moving from New Jersey to Solutions House in Philadelphia, and requested a visit with Child. *Id.* at 35-36. Ms. Maturani informed Father that a visit could be arranged if Father returned to the Northumberland County area. *Id.* at 36. Father did not request any visits with Child after that date. *Id.* at 37.

Ms. Maturani explained that she last spoke with Father on June 26, 2014. *Id.* at 29. During that conversation, Father requested, *inter alia*, that Child's case be transferred to Philadelphia, and that she be placed with

Father's mother. *Id.* Ms. Maturani informed Father that cases typically are not transferred, and that his mother could contact her to discuss a home study. *Id.* at 29-30, 36-37. Finally, Ms. Maturani noted that aggravated circumstances were found as to Father on July 17, 2014. *Id.* at 53-54. Father participated in the aggravated circumstances hearing by phone.[6] *Id.* at 50, 53.

Father testified that he began residing in Solutions House on approximately May 13, 2014, and that he moved to his mother's home in New Jersey about three weeks prior to the termination hearing. *Id.* at 72-74. Father admitted that he never told CYS that he moved in with his mother because "I've just been busy I guess." *Id.* at 88. Father described Solutions House as a "sober living facility" where he was subject to drug tests and had the opportunity to attend counseling, *inter alia*. *Id.* at 73, 90. Prior to living at Solutions House, Father received 7 days of inpatient rehabilitation treatment at White Deer Run. *Id.* at 74.

Father further testified that he is done with treatment, and that he has been clean since May 6, 2014. *Id.* at 75-76. Since being discharged from treatment, Father stated that he has been working, trying to pay his bills

---

[6] Foster Father testified that he met Father once, about two weeks after he started taking care of Child in January of 2014, but that he has not spoken with Father since that time. N.T., 10/8/2014 (Part 2), at 60, 63. Foster Father also recalled that he received a Christmas card for Child from Father, which he placed in Child's room. *Id.* at 65-66.

and "keep up on my fines and everything," and trying to get his driver's license back. *Id.* at 79-80. According to Father, he did not participate in Child's life prior to residing at Solutions House because he was trying to focus on his drug issues. *Id.* at 78, 82. Father indicated that he received some training with respect to Child's medical care prior to Child's placement in May of 2013, but that "[a] lot of things have changed with her . . . ." *Id.* at 94. Father admitted that he currently is not prepared to care for Child, but stated, "I would like to try to pursue that." *Id.* at 85, 97.

Thus, the testimonial evidence demonstrates that Father refused or failed to perform parental duties for a period of at least six months prior to the filing of the petition to terminate his parental rights on May 29, 2014. During the beginning of the relevant six-month period, Father sent Child letters and visited with Child once on January 31, 2014. However, following this visit, Father failed almost entirely to involve himself in Child's life. Father did not request another visit with Child until May of 2014, at which time he was living in Philadelphia. When Father was informed that he would have to travel in order to visit with Child, he failed to do so. Moreover, Father has never completed the necessary medical training that he would need to care for Child. Father's actions demonstrate a "merely passive interest" in Child, at best. *B.,N.M.*, 856 A.2d at 855. As such, Father's conduct warrants termination pursuant to Section 2511(a)(1).

Having determined that the orphans' court properly terminated Father's parental rights pursuant to Section 2511(a)(1), we now review the order pursuant to Section 2511(b). The orphans' court found as follows:

> Here, the [c]ourt examined the existence and quality of the bond between [] Father and . . . Child. The Guardian Ad Litem, in support of her recommendation that the petition for termination be granted, stated that to the extent that any bond exists, "…severing the bond with [Father] [] would not have a detrimental impact on [Child] at all[.] In fact, it would have a detrimental impact on her if the bond were severed between her and her foster parents…"
>
> The [c]ourt, after hearing the testimony, concluded, "I don't believe there is any emotional bond between you and the child. You have not seen that child since January 31st of this year. She was barely a year old. There is no emotional bond between you and the child that needs to be severed or would be damaged by her not seeing you. I doubt that she would know you if she saw you." There was no evidence of any bond, and in the absence of such evidence, the [c]ourt reasonably inferred that no such bond exists between [] Father and . . . Child. Further, . . . Child has established a firm bond with her foster family, a family with whom she has lived since January of 2014 and that is willing to provide permanency for . . . Child. The pairing of . . . Child with this foster family is particularly fortuitous when one recalls that these foster parents have attended medical trainings specific to the medical issues experienced on a daily basis by . . . Child (to say nothing of their independent medical training as EMTs) and have been steadfast in their attentiveness and responsiveness to all of her medical needs since her arrival in their home. The best interests of . . . Child would be served by termination of [] Father's parental rights.

Orphans' Court Opinion, 12/6/2014, at 9-10 (citations to the record omitted). Again, the testimonial evidence supports the court's findings.

Foster Father testified that both he and Child's foster mother are paramedics. N.T., 10/8/2014 (Part 2), at 60, 70. Foster Father explained

that Child has been residing in his home since January of 2014. *Id.* at 60. Child requires medical attention 24 hours per day, and a nurse comes to the foster home to care for Child during the times that Foster Father and Child's foster mother are working. *Id.* at 61. Child has no kidneys, and undergoes nightly dialysis treatments. *Id.* In addition, Child suffers from congestive heart failure and has experienced two strokes. *Id.* at 61-62. She is fed through a feeding tube in her belly, and also suffers from chronic vomiting and sleep apnea issues. *Id.* at 61. Foster Father stated that he is willing to continue providing care for Child in the future. *Id.* at 64. Where, as here, the petitioner is an agency it is not necessary that an adoption is presently contemplated nor that a person with a present intention to adopt exists. 23 Pa.C.S. § 2512(b).

Based upon this evidence, we discern no abuse of discretion by the orphans' court in terminating Father's parental rights pursuant to Section 2511(b). It was reasonable for the court to infer that there is no bond between Father and Child, given Child's age and Father's lack of recent visits. *In re Adoption of J.M.*, 991 A.2d at 324. In addition, Child's extensive medical needs are being met in her current foster placement.

Accordingly, we affirm the decree involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/30/2015